# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| STEPHEN M. QUILTY, individually and on behalf of others similarly situated, | |
| *Plaintiff,* | Case No. _____ |
| v. | **JURY TRIAL DEMANDED** |
| ENVISION HEALTHCARE CORP., EMCARE HOLDINGS INC., EMCARE INC., and BAXLEY EMERGENCY PHYSICIANS, LLC, | **INJUNCTIVE RELIEF SOUGHT** **CLASS ACTION** |
| *Defendants.* | |

## COMPLAINT

Plaintiff Stephen M. Quilty, on behalf of himself and all other similarly situated, brings this class action against Defendants Envision Healthcare Corporation, EmCare Holdings Inc., EmCare Inc., and Baxley Emergency Physicians, LLC (collectively, "Envision" or "Defendants"). Plaintiff, based upon personal knowledge of the facts pertaining to himself, and upon information and belief as to all other matters, hereby alleges as follows:

## INTRODUCTION

1.      This is a consumer protection action that seeks damages and injunctive relief arising from Defendants' unlawful and deceptive acts and practices in the Florida healthcare market for emergency room physician services. Florida law prohibits hospitals, physicians, and other healthcare professionals ("providers") from collecting or attempting to collect

1

money directly from commercially insured individuals who received emergency medical care, regardless of whether the facility or provider participates in the insured's health insurance network. Defendants have, for years, directly ignored this law.

2. Defendants manage approximately three dozen or more hospital emergency departments ("EDs") in Florida for non-profit and for-profit hospital clients. When hired by a hospital-client, Defendants manage responsibilities for, among other things: recruiting, hiring, or affiliating with physicians and other healthcare professionals; treating all patients who arrive at the client's ED; and billing and collecting monies from commercial insurance companies ("payors") for medical services performed on their subscribers.

3. Plaintiff and the proposed Class (defined below) are commercially insured consumers of ED healthcare services who sought emergency medical care from physicians employed by, or affiliated with, Defendants,

4. Since at least 2011, Defendants have engaged in a deliberate corporate scheme to raise revenue and profits by refusing to contract with many commercial payors throughout Florida. Without network contracts, Defendants may set *any* price for services rendered. Defendants initially seek reimbursement for services from the patient's insurance company. Some payors may offer Defendants the "usual and customary" rates—*i.e.*, the rates typically paid by that insurer to in-network providers in that geography for similar services rendered— while other payors may refuse to reimburse Defendants for any costs because there was no network contract. Defendants accept the insurance payment, where offered, and then hold the patient directly liable for the balance of the bill.

5.      The practice of "balance-billing" emergency room patients is permitted in some states.  However, in Florida, balance-billing patients for emergency room services is illegal.  Fla. Stat. § 627.64194 *et. seq.*; Fla. Stat. Ann. § 641.513 *et. seq.*  Defendants do not disclose the unlawfulness of their billing tactics to Plaintiff or Class members.  Instead, when Plaintiff and Class members asked Defendants questions about their bills, Defendants intentionally and deceptively induced them to pay these hefty out-of-network bills by, for example, threatening to send the bill to collections for non-payment.

6.      Plaintiff and members of the Class were harmed, and continue to be harmed, by Defendants' unfair and deceptive business practices in violation of Florida law.  Consequently, Plaintiff on behalf of himself and all others similarly situated, hereby brings this action for violations of state laws, seeking monetary damages, and appropriate injunctive, declaratory and equitable relief, including but not limited to an injunction to stop Defendants from continuing their unlawful acts and practices.  Plaintiff and members of the Class are also entitled to a significant award of punitive or exemplary damages, given that, for years, Defendant deliberately and with malice deceived Plaintiff and members of the Class into paying fraudulently charges under state law.

## PARTIES

7.      Plaintiff, Stephen M. Quilty, is a Florida domiciliary.  On April 1, 2014, Mr. Quilty visited the Medical Center of Trinity in Trinity, Florida, seeking emergency medical care for injuries sustained.  Mr. Quilty received a bill from Defendants for services rendered, which he paid.

3

8.     Defendant Envision Healthcare Corp ("Envision") is a publicly traded for-profit nationwide provider of healthcare services, including physician services. Envision's physician services contracts covers more than 1,5000 clinical departments at healthcare facilities in 45 states and the District of Columbia. Envision employs or has direct affiliations with over 46,200 physicians and other healthcare providers. In 2016, Envision delivered care to more than 15.2 million emergency department episodes in 41 states. The emergency department and hospitalist services segment of Envisions business accounts for 59 percent of its physician services revenue, which in turn, accounts for 63 percent of Envisions entire revenue stream. Envisions' total net revenue in 2016 exceeded $3.7 billion. Envision is organized under the laws of Delaware. Envision's principle places of business are at 1A Burton Hills Blvd, Nashville, TN 37215 and 6200 South Syracuse Way, Greenwood Village, CO 80111.

9.     EmCare Holdings Inc., is a wholly owned subsidiary of Envision. EmCare Holdings Inc. was organized under the laws of Texas and its principle place of business is 13737 Noel Road, Suite 1600, Dallas, TX 75240.

10.     EmCare Inc., is a wholly owned subsidiary of EmCare Holdings Inc. EmCare Inc. is a physician practice management company that provides outsourced facility-based physician services for clinicians, hospitals, health systems, and other healthcare clients in the United States. The company offers integrating clinical services; emergency medicine services; and hospital medicine services, and helps hospitals manage their purchasing programs, lengths of stay management, daily inpatient care management, discharge care coordination with providers, recruit/retain physicians, physician leadership

training/education, post-discharge follow-up, access to intensivists, coding and billing services, and customizing financial and staffing models. It also provides acute care/trauma surgery services with hospital-based general surgeons, as well as trauma program development and management services; anesthesiology services, such as anesthesia and pain management. EmCare Inc. was organized under the laws of Texas and has its principle place of business at 13737 Noel Road, Suite 1600, Dallas, TX 75240.

11.    Baxley Emergency Physicians, LLC ("Baxley") is a wholly owned subsidiary of EmCare Inc. Baxley is a provider of emergency physician services to hospitals, including the Medical Center of Trinity in Florida. Baxley's business practice location is 5637 Marine Pkwy, New Port Richey, FL 34652, however, its business mailing address is listed as 13737 Noel Road, Suite 1600, Dallas TX, 75240.

## JURISDICTION AND VENUE

12.    This action arises under: Fla. Stat. § 501.201, *et. seq.*; Fla. Stat. § 627.64194, *et. seq.*; and Fla. Stat. § 641.513, *et. seq.*

13.    The action seeks to obtain injunctive relief and recover damages, the costs of suit, and reasonable attorneys' fees for injuries sustained by Plaintiff and Class members, defined below, caused by Defendants' unlawful, deceptive, and unconscionable acts and practices in the market for emergency physician services.

14.    The Court has subject matter jurisdiction under 28 U.S.C. § 1331. The Court also has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d) because at least one Class member is of diverse citizenship from the

Defendant, there are more than 100 Class members, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interests and costs.

15.     The Court has jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367.  Defendants transacted business, maintained substantial contacts, and committed overt acts in furtherance of this illegal scheme in this District.  The scheme was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in this District.

16.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b), (c), and (d) because during the Class Period, Defendants resided, transacted business, was found, or had agents in this District, and a substantial portion of the alleged activity affecting interstate trade and commerce was carried out in this District. During the Class Period, Plaintiff, and other Class members, received emergency care from providers employed by or affiliated with Defendants in this District.  Defendants contract and provide service with dozens of hospitals in Florida, some of which are located in this District.

## FACTUAL ALLEGATIONS

### A. The Market for Outsourcing Hospital ED Physician Services.

17.     There are approximately 4,500 EDs throughout the United States, which are staffed by 40,000 physicians and deliver more than 130 million episodes of care annually. Approximately 1 in 5 individuals living in the United States visit an ED each year.  EDs are the "doorway to the hospital"—50 percent of hospital inpatient beds are filled by patients admitted through the ED.

18.     EDs are very busy, complicated places.  Hospitals compete vigorously on length of patient wait time prior to treatment.  Hospitals that fail to efficiently staff and manage the throughput of ED patients lose money and patient satisfaction scores on a crucial segment of their business.  Alternatively, hospitals with high throughput and strong customer satisfaction have EDs that generate revenue for the system.  Efficiently run, well-utilized EDs are, therefore, crucial to a hospital's bottom line.

19.     Hospitals struggling to efficiently staff and manage their EDs have turned to outsourcing firms as a possible solution.  In 2015, 22 percent of U.S. hospitals outsourced the management and staffing of their ED to national firms like Defendants.  Many of these hospitals are located in rural and suburban communities.

20.     Services provided to hospitals by ED management firms, like Defendants, include: recruiting, scheduling, and credential coordination for clinical and non-clinical medical professionals; coding, billing, and collection of fees for services provided by medical professionals; providing experienced medical directors; providing administrative support services, such as payroll, professional liability insurance coverage, continuing medical education services, and management training; providing claims and risk management services; and standardizing procedures and operational consulting to improve quality of care.

**B.  Creating "Networks" through Payor-Provider Contract Negotiations.**

21.     When an insured patient seeks emergency care at a hospital that runs its own ED, the patient typically pays a small fee (*i.e.*, a co-pay, co-insurance, or certain spending under their deductible, as governed by their insurance benefits).  The hospital sends the

remainder of the bill to the patient's insurance. The bill includes a fee for the use of the facility and a fee for the cost of emergency services rendered.

22.   Comparatively, when an insured patient seeks emergency care at a hospital that has outsourced its ED, the patient still pays a small fee, but the bill sent to the patient's insurance is bifurcated: there is a bill from the hospital for use of the facility and a bill from the physicians (or the company managing the ED physicians) for the cost of emergency services rendered.

23.   In either circumstance, the amount billed is governed by a payor-provider contract where such a contract exists.

24.   Payors negotiate contracts with hospitals and physicians to create networks of providers. These contracts benefit payors by establishing competitive prices for services rendered. The contracts benefit providers by creating incentives for insured patients to seek care from their provider system. Beneficiaries have lower co-pay, co-insurance, or certain spending under their deductible if they seek care from "in-network" providers, so they tend to specifically seek out those providers when feasible (which is not always the case in medical emergencies).

25.   A provider's willingness to contract depends, in large part, on the payor's ability to get patients to seek out and utilize the provider's medical services. A hospital system cannot survive without network contracts with most local payors because payors would respond by steering insured patients to competitor systems. For ED outsourcing firms, the incentives to contract with payors differ.

26.     Unlike most hospital services, emergency medicine is not scheduled or elective.   In a medical emergency, the patient lacks the time to shop for in-network physicians.  Choice is even further restricted if the patient arrives at the ED by ambulance, which may be required to take patients to the closest appropriate facility.     Then, upon arriving at the ED, the treating-physician is almost always assigned to the patient without any information, choice, or input from the patient.  At the time of treatment, an ED patient is, therefore, typically unaware whether the physician is affiliated with the hospital or a third-party group.

27.     Consequently, the incentives for Defendants to contract with payors is decidedly different than that of the hospital because patients will continue to show up at the ED regardless of whether Defendants develop in-network contracts with local payors. Recognizing this, Defendants implemented a deceptive and unlawful corporate scheme whereby Defendants' physicians hide behind the veil of the hospital's network.  Consumers then arrive at the in-network hospital seeking ED treatment, which Defendants provide. Defendants do not inform patients that the treating physician is out-of-network.  In other jurisdictions, Defendants are then permitted to bill the patients' insurance *any* amount for services rendered and hold the patient directly liable for the balance.  Florida, however, has outlawed Defendants' practice of holding patients directly liable for the balance.

**C.  Consequences of Visiting Out-of-Network ED Providers.**

28.     The consequences of visiting an out-of-network physician in a non-emergency setting varies by insurance policy, but three outcomes are possible. First, the payor may elect to cover the physician's out-of-network bill in its entirety, less any co-insurance paid by the

patient (which is typically higher when visiting an out-of-network provider).  Second, the payor covers the out-of-network bill at its "usual and customary rate," which is based on the average charges for the services provided in that geography.  Because the "usual and customary rate" is typically less than total billed charges, the physician then has the choice to accept the monies paid by the insurance as sufficient or pursue the balance of the bill from the patient.  Third, the payor may refuse to cover any out-of-network costs, leaving the patient liable for the entire bill.

29.    In most circumstances, patients seeking medical attention have an opportunity to check their network to ensure they choose an in-network provider.  However, in the emergency context, as previously discussed, the patient has no choice over their individual emergency physician even if they have a choice in facility—*i.e.*, they did not arrive at the ED by ambulance, which usually takes the patient to the closest appropriate facility.  Consequently, it is unsurprising that privately insured patients are often treated at an in-network hospital by out-of-network ED physicians without their knowledge.

30.    The financial burden of these out-of-network bills on patients is enormous.  Nation-wide 32 percent of patients who received a surprise medical bill reported financial trouble paying that bill.  Debt accrued from out-of-network ED physician bills reportedly represents the largest share of patient debt.

**D.     Florida Law Prohibits "Balance-Billing" From Out-of-Network Providers.**

31.    To address out-of-network billing issues, Florida passed laws prohibiting providers from "balance-billing" patients for emergency services (*i.e.*, seeking the remainder of the bill not paid through co-pays or primary insurance).  In 1996, Florida passed a law

holding HMOs—a type of insurance that requires beneficiaries to visit the HMO's prior authorized network of providers to receive any insurance benefits—liable for emergency care services used by beneficiaries when an emergency medical condition exists regardless of whether the beneficiary visited a contract or non-contract provider. Fla. Stat. § 641.513 *et. seq.* Providers may not collect or attempt to collect money from a subscriber for payment of services for which the HMO is liable if the provider in good faith knows or should know that the HMO is liable. Fla. Stat. § 641.3154.

32.    In June 2016, Florida extended the prohibition on balance-billing ED patients to other insurance products, including preferred provider organizations ("PPO") and exclusive provider organizations ("EPO"). Fla. Stat. § 627.64194 (explaining, "[a]n insurer is solely liable for payment of fees to a nonparticipating provider of covered emergency services provided to an insured in accordance with the coverage terms of the health insurance policy, and such insured is not liable for payment of fees for covered services to a nonparticipating provider of emergency services, other than applicable copayments, coinsurance, and deductibles.").

33.    Plaintiff and members of the Class all visited an ED managed by Defendants. Plaintiff and members of the Class all received a balance-bill for out-of-network physician services rendered by Defendants. Plaintiff and members of the Class were all induced by Defendants to pay these unlawful bills.

**D. Defendants Unlawful Balance-Billing Scheme.**

34.    Since at least 2011, Defendants have engaged in a corporate scheme to directly bill insured patients for out-of-network for ED services, even though Florida law

prohibits such conduct. In July 2017, an independent group of economists published a study assessing the effects on a community following the local hospital's decision to outsource management of the ED to Defendants. The findings were striking. Compared to the two years prior to Defendants market entry, the number of patients billed as out-of-network jumped 70.7 percent the first year and 24.9 percent the second year. Nationally, Defendants billed patients out-of-network 62 percent of the time.

35.     The study also found that after market entry by Defendants physician payments increased, on average, 117 percent (or $447.90) per episode, and average physician charges increased 96 percent ($556.84). Raising physician charges permitted Defendants to raise the "usual and customary rates" paid by insurance companies for out-of-network care, which in turn, permitted Defendants to demand even higher fees for services. The purpose of Defendants actions was to raise corporate revenue and profits at the expense of consumers who are ultimately held accountable by Defendants for the remainder of any unpaid, inflated bills.

36.     Defendants actions are expressly unlawful in Florida, which has outlawed the practice of holding insured patients liable for ED bills because the State recognized that, in such circumstances, the patient has no recourse. In the context of an emergency, ambulances take patients to the closest appropriate facility. Patients that arrive at the ED by non-ambulance transportation, may choose the facility based on prior knowledge of which facilities are in-network while others may, if it is feasible in an emergency, check their insurance website or the website of the local hospital prior to leaving. Such information,

however, still fails to inform the consumer whether the treating physician is "in-network." In all circumstances, Defendants exploit the lack of choice or information to ambush patients.

37.     At no point after the patient arrives at the ED is it disclosed to the patient that the treating physician is not affiliated with the hospital and is, therefore, out-of-network (nor is it often feasible at that point for a patient to object and obtain care elsewhere). Moreover, even if it were disclosed, once at the hospital, no reasonable emergency patient would leave the ED to seek services elsewhere. Only months later do patients find out the truth: that Defendants are holding them responsible for paying a considerable sum of money for their out-of-network physician care.

38.     Moreover, when Plaintiff and Class members contacted Defendants with billing questions, Defendants mislead the patients by failing to inform Plaintiff and Class members that Defendants were not permitted to hold patients liable for their bills, pursuant to state law. Plaintiff and Class members then paid the bill, believing that the bill is lawful and justified and that non-payment would result in the bill being sent to collections.

39.     Defendants' unlawful corporate practice continues unabated. The United States Congress has even gotten involved. In October 2017, Senator Claire McCaskill (D-MO), sent a strongly-worded letter to Christopher Holden, President and CEO of Envision, through the U.S. Senate Committee on Homeland Security and Governmental Affairs. The letter, which also included a request for production of certain documents, warned Defendants that "if [Defendants are] gaining the system just to up their profits, that needs to be thoroughly investigated" due to the "significant adverse impacts on the communities where [Defendants] operate[] and on the unsuspecting patients."

40.     Moreover, in December 2017, it was announced that Envision would settle a U.S. Department of Justice qui tam lawsuit for $31 million, which alleged the Company, along with Health Management Associates, fraudulently admitted patients from the ED to maximize profits and without regard to whether the admissions were medically necessary.

## PLAINTIFF'S EXPERIENCE

41.     On April 1, 2014, Plaintiff Stephen M. Quilty sustained a facial injury that required immediate medical attention. Mr. Quilty, a resident of Lutz, Florida, was taken by ambulance to the Medical Center of Trinity to receive emergency care. At the time, Mr. Quilty had health insurance through a United Healthcare HMO. The Medical Center of Trinity was in Mr. Quilty's insurance network. The treating provider, Baxley Emergency Physicians, did not participate in United Healthcare's network. Mr. Quilty was not made aware of this discrepancy at the time of admission to the ED. Mr. Quilty had the expectation that the insurance company would handle the billing as he sought treatment at an in-network facility.

42.     Then, in May 2014, Mr. Quilty received a bill for $22,482.00 from Trinity Medical Center for hospital services rendered. Pursuant to his insurance coverage, United Healthcare covered $19,182, and Mr. Quilty paid the remainder. Mr. Quilty also received a $2,255.01 bill from Baxley for out-of-network physician services. The bill purported to cover services rendered by Dr. Jennifer Nuss. At no time did Mr. Quilty interact with Dr. Nuss—Mr. Quilty was primarily treated by a physician's assistant, Paul Emerson Jones.

43.     Mr. Quilty called Baxley to better understand the bill. Specifically, he asked why he was being billed for services provided by a physician that never interacted with him.

Mr. Quilty was informed that Dr. Nuss was the on-duty emergency physician at that time and that he was responsible for payment for services rendered in the amount specified on the bill. Mr. Quilty consequently wrote Defendants a check for $2,255.01. Mr. Quilty did not want the bill to be turned over to a collection agency, and subsequently have to deal with an additional hassle or the potential effect on his credit rating.

## CLASS ACTION ALLEGATIONS

44.     Plaintiff brings this class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), (b)(3), and (c)(4) on his own behalf and as a representative of the Class as defined below, with respect to claims arising at any time between January 1, 2011 and until such time as the unlawful, deceptive, and unconscionable acts and practices cease (the "Class Period").

45.     Plaintiff brings this action on behalf of himself and as a representative of the following class ("Class"):

> All commercially insured beneficiaries that live or reside in Florida who sought emergency medical care at an in-network hospital managed by Defendants and who were subsequently balance-billed for the cost of that care.

46.     Excluded from the Class are the defendants and their officers, directors, management, employees, subsidiaries, or affiliates; and any judges or justices involved in this action, and any members of their immediate family.

47.     Numerosity: Joinder of the members of the Class is impracticable. Plaintiff believes the members of the Class are numerous and widely dispersed throughout the United States. Further, the Class are readily identifiable from information and records in the possession of Defendants. Direct notice to the members of the Class can be made upon

obtaining the relevant information and records in the possession of Defendants and third-parties.

48.  Typicality: Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff and all Class members were damaged by the same wrongful conduct. Specifically, all received unlawful, fraudulent bills in the mail from Defendants, and wrongly paid (or are being pursued) for the cost of that care.

49.  Adequacy: Plaintiff will fairly and adequately protect and represent the interests of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the Class.  Plaintiff and the Class are represented by counsel who are experienced and competent in the prosecution of complex, class action consumer protection litigation.

50.  Commonality: Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members, and because Defendants acted on grounds generally applicable to the Class, injunctive relief and damages with respect to the Class are appropriate.

51.  Questions of law and fact common to the Class include:

    a.  whether Defendants' billing practices violated state law;

    b.  whether Defendant activities alleged herein have substantially affected the market for emergency physician services;

    c.  whether, and to what extent, Defendant conduct caused injury to Plaintiff and Class members;

    d.  the quantum of overcharges paid by Plaintiff and Class members in the aggregate; and

e. the type and scope of injunctive relief needed to end Defendants'

illegal conduct.

52. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit many similarly situated, geographically dispersed persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

## CLAIMS FOR RELIEF

### Count I

### Violation of Florida Balance-Billing Laws

53. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

54. The primary purpose of these laws is to prohibit patients from being balance billed for emergency services.

55. Originally, only HMOs were prohibited from balance-billing subscribers for emergency services. HMOs were required to provide emergency care coverage without prior authorization regardless of whether the care was rendered by a participating on nonparticipating provider. The law required the HMO to pay nonparticipating providers

specified minimum reimbursement for emergency services net of any applicable co-payment. Fla. Stat. § 641.513.

56.    Florida later extended the prohibition on balance-billing to EPO and PPO subscribers who received emergency services.   Fla. Stat. § 627.64194 *et. seq.*   The law mirrored the HMO law, by prohibiting prior authorization, requiring coverage regardless of whether the provider is a participating or nonparticipating provider, and requiring cost-sharing to be the same regardless of whether services were provided by a participating or nonparticipating provider.

57.    The reimbursement methodology of the EPO and PPO law also tracks the HMO law, requiring health plans to reimburse an emergency care provider the lesser of: the provider charges; the usual and customary provider charges for similar services in the community where the services were provided; or a mutually agreed on charge within 60 days after submittal of the claim.

58.    Where a dispute arises, Fla. Stat. § 627.64194 permits the dispute to be resolved in a court of competition jurisdiction.

59.    Defendants have, for years, directly billed HMO, EPO, and PPO subscribers for emergency services rendered.

60.    Defendants have, for years, directly violated Florida law as described herein.

61.    As a direct and proximate result of Defendants' violations of the Florida's law prohibiting balance-billing, Plaintiff and the Florida Class seek resolution pursuant to a court of competent jurisdiction, Fla. Stat. § 627.64194.

62.     Plaintiff and the Class suffered ascertainable loss and actual damages in an amount to be proven at trial as the direct and proximate result of Defendants' unlawful conduct.  Plaintiff and the Florida Class members who received emergency room services from Defendants would not have paid for the services billed but for Defendants direct violation of state laws.

63.     Plaintiff and the Class seek actual damages, including interest, and punitive damages for Defendants unlawful conduct.

64.     Plaintiff and the Class seek an injunction to stop Defendants from continuing their unlawful acts and practices.

### Count II

### Violation of Florida's Unfair & Deceptive Trade Practices Act
### (Fla. Stat. § 501.201, *et seq.*)

65.     Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

66.     The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2).

67.     Chapter 501, Fla. Stat., Florida's Deceptive and Unfair Trade Practices Act is to be liberally construed to protect the consuming public, such as Plaintiff in this case, from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.

68.     Plaintiff is a "consumer" within the meaning of Fla. Stat. § 501.203(7).

69. Defendants engaged in "trade and commerce" within the meaning of Fla. Stat. § 501.203(8).

70. While FDUTPA does not define "deceptive" and "unfair," it incorporates by reference the Federal Trade Commission's interpretations of these terms. The FTC has found that a "deceptive act or practice" encompasses "a representation, omission or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment."

71. A claim for damages under the FUDTPA has three elements: (1) a prohibited practice; (2) causation; and (3) actual damages.

72. Under Florida law, providers are not allowed to balance-bill consumers with HMO insurance who sought emergency care. *See* Fla. Stat. § 641.513 *et. seq.*; Fla. Stat. § 641.3154 *et. seq.*; Fla. Stat. § 627.64194 *et. seq.* Defendants violated Florida law by billing Plaintiff and Class members for ED services rendered.

73. Defendants' conduct constitutes an unconscionable, deceptive, or unfair acts or practice in the market for physician emergency services because Defendants engaged in conduct that violates Florida law. Defendants also engaged in unconscionable, deceptive, or unfair acts or practice in the market for physician emergency services.

74. Defendants had an ongoing duty to refrain from unfair and deceptive practices under the FDUTPA.

75. Defendants' unlawful acts and practices complained of herein affect the public interest.

76.     Defendants unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and Class members, into paying for services for which they were not liable.

77.     Plaintiff and the Class suffered ascertainable loss and actual damages in an amount to be proven at trial as the direct and proximate result of Defendants' unlawful conduct, misrepresentations and their concealment of and failure to disclose material information. Plaintiff and the Florida Class members who received emergency room services from Defendants would not have paid for the services billed but for Defendants conduct.

78.     As a direct and proximate result of Defendants' violations of the FDUTPA, Plaintiff and the Florida Class have suffered injury-in-fact and actual damage.

79.     Plaintiff and the Florida Class are entitled to recover their actual damages, including interest, under Fla. Stat. §501.211(2), and attorneys' fees under Fla. Stat. §501.2105(1).

80.     Plaintiff also seek an order enjoining Defendants' unfair, unlawful, and deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the FDUTPA.

### Count III

### Unjust Enrichment

81.     Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

82.     Defendants engaged in unlawful, fraudulent, and deceptive conduct as set forth herein.

83.     As a result of Defendants' conduct, Plaintiff and Class members conferred a benefit on Defendants by paying for out-of-network services that were improperly balance billed to them in violation of Florida law.

84.     Defendants accepted and retained the benefit in the amount of sums collected as a result of its unlawful balance-billing practices at the expense of Plaintiff and Class members under circumstances in which it would be unjust and inequitable for Defendants to be permitted to retain the benefits of its wrongful conduct.

85.     Plaintiff and the Class members are entitled to full refunds (including interest), restitution, and/or damages from Defendants and/or an order of this Court proportionally disgorging all profits, benefits, and other compensation obtained by Defendants from its wrongful conduct. If necessary, the establishment of a constructive trust from which Plaintiff and Class members may seek restitution or compensation may be created.

86.     Additionally, Plaintiff and Class members may not have an adequate remedy at law against Defendants, and accordingly plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pled herein.

**Count IV**

**Declaratory Relief, 28 U.S.C. § 2201**

87.     Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

88.     An actual controversy now exists between Plaintiff and the Class members on the one hand, and Defendants on the other, concerning Defendants' unlawful balance-billing practices described herein.

89.     Accordingly, Plaintiff and the Class are entitled to seek a judicial determination of whether Defendants' acts and practices described in this Complaint violate the laws of Florida and/or other states so that (1) the rights of Plaintiff and the Class may be determined with certainty for purposes of resolving this litigation; and (2) so that the parties and the marketplace have a consistent understanding of Defendants' legal obligations moving forward so that patients are not at risk of being unlawfully balance billed for future healthcare services.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and behalf of members of the Class, respectfully request the Court: grant certification of the proposed Class; designate Plaintiff as the named representatives of the respective Class; appoint the undersigned as Class Counsel; and enter judgment in their favor and against Defendants as follows:

A.     An order permanently enjoining Defendants from continuing the unlawful, deceptive, fraudulent, harmful, and unfair business conduct and practices alleged in this Complaint;

B.     Order requiring Defendants to pay both pre- and post-judgement interest on any amounts awarded;

C.     Award costs and attorneys' fees, as allowed by law; and

D.    Award such other or further relief as the Court may deem appropriate, just, and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demand a trial by jury of any and all issues in this action so triable of right.

DATED:  February 7, 2018

**WITES LAW FIRM**

By: */s/ Marc A. Wites*
      Marc A. Wites

MARC A. WITES
Fla. Bar No. 24783
THOMAS B. ROGERS
Fla. Bar No.: 054680
4400 N. Federal Highway
Lighthouse Point, FL  33064
Telephone:  (954) 933-4400
Email: mwites@witeslaw.com

**KAPLAN FOX & KILSHEIMER LLP**
Laurence D. King (to be admitted *pro hac vice*)
Matthew George (to be admitted *pro hac vice*)
350 Sansome Street, Suite 400
San Francisco, CA  94104
Telephone:  (415) 772-4700
Facsimile:  (415) 772-4707
Email: lking@kaplanfox.com
        mgeorge@kaplanfox.com

**KAPLAN FOX & KILSHEIMER LLP**
Frederic S. Fox (to be admitted *pro hac vice*)
Donald R. Hall, Jr. (to be admitted *pro hac vice*)
Aaron Schwartz (to be admitted *pro hac vice*)
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone:  (212) 687-1980
Facsimile:  (212) 687-7714
Email: ffox@kaplanfox.com
        dhall@kaplanfox.com
        aschwartz@kaplanfox.com

*Attorneys and Trial Counsel for Plaintiff*